ANNA COOPER, Appellee, v. WILLIAM QUADE, Appellant.

**BOUNDARIES: Conflicting Monuments and Field Notes.** Established
government monuments prevail over field notes, even when such
monuments are wholly obliterated, provided the evidence is suffi-
cient to identify the places where such monuments were originally
located. If such monuments are wholly obliterated and incapable of
relocation, resort must necessarily be had to the field notes. Sur-
vey record reviewed and confirmed in accordance with the holding of
the trial court, even though not in harmony with the field notes.

*Appeal from Webster District Court.*—H. E. FRY, Judge.

MAY 6, 1921.

THE opinion sufficiently states the case.—*Affirmed.*

*Mitchell & Files,* for appellant.

*Price & Burnquist,* for appellee.

WEAVER, J.—Plaintiff and defendant are adjoining own-
ers of lands in Sections 31 and 32 in Township 89 north, of
Range 30 west, in Webster County, Iowa. Defendant's farm
lies immediately north of the mid-section line, and plaintiff's
immediately south of it, and the litigation between the parties
originated in a dispute over the proper location of this common
boundary. In May, 1918, plaintiff brought suit, alleging that
the line had for many years been located by mutual acquiescence
of the respective owners, but that defendant, disregarding the
same, had constructed a fence some 60 feet south of the old
fence, asserting that the true line was the one on which the new
fence was built, and proposing to maintain the same as the per-
manent boundary. Plaintiff therefore sought a decree establish-
ing and confirming her claim of title to the land so brought into
controversy, and establishing and confirming the line of the old
fence as the true line of division.

Defendant denied that any line other than is indicated by
the government survey had ever been agreed upon or acquiesced

in by the parties, and asserted that the true line, as fixed by the government survey, is the one on which he had built his fence.

After the suit had been pending several months, and the pleadings had been variously amended, the parties, together with other landowners having an interest in the true location of the boundary lines in that vicinity, entered into a written agreement by which, after stating the nature of the controversy which had arisen, and their mutual desire to have the boundaries correctly located and established, stated the terms of the agreement, which, so far as is here material, were as follows:

"Now, therefore, it is agreed by and between the parties hereto that J. L. Parsons shall be, and he is, hereby nominated and appointed as the surveyor for the purpose of locating the said lines herein referred to and the boundaries between the respective parcels of land herein referred to, with the understanding that the said surveyor shall go to Des Moines and procure the government field notes for the original survey of Section 31, and such portion of Section 32 as may be necessary to correctly determine the true location of said boundary line. The said surveyor so selected shall permit each and all of the parties hereto to be heard in person and by such witnesses as they desire to produce, either at the time the said survey is made upon the grounds, due notice of which shall be given to all of the parties hereto, or at such other time and place as may be designated by him, or both.

"Said surveyor shall take into consideration all of the stones and corner markings to which his attention may be called by the parties or their witnesses, also, previous surveys, fences, and any other facts which may have a bearing upon the true location of said boundaries, and may do such other and further acts as in his judgment may be required for the purpose of correctly, equitably, and fairly adjudicating the rights between the parties hereto with reference to said boundaries. Should there appear to be either an excess or shortage in the lands of any of the parties hereto, it shall be apportioned according to law in locating said boundary lines.

"Upon completion of his survey, the said surveyor herein named shall confer with C. A. Snook and John Moeller, and the decision of two of the three arbitrators herein named shall

be binding and effective upon the parties hereto, and such report shall be prepared in writing and filed in the office of the clerk of the district court of Webster County, Iowa, as part of the files in the case of Anna Cooper v. William Quade."

Thereafter, a survey having been made, the surveyor, J. L. Parsons, and J. A. Moeller, two of the persons named in said agreement, united in making a report thereof to the district court as follows:

"To the District Court of Webster County, Iowa: We, the undersigned, wish to report that the provisions of the contract signed by William Quade, Anna Cooper, George Luebke, and John Black have been carried out, and the following report is respectfully submitted. After an examination of all the corners and boundaries involved in the controversy, a conference with the landowners concerned and others having any knowledge of these lines and corners, and an investigation of the government survey records and the county surveyor records, the corners marked 'found' and 'established' on the accompanying plat have been used, and the true corners and boundary lines established accordingly. The quarter corner used between Sections 31 and 32 is north of the midpoint between section corners and west of a straight line between said corners, but it is the conclusion of the undersigned that this point is a perpetuation of the point established for this corner by the government surveyor. All known resurveys since the original survey have been based upon this point as the true corner. The record of a survey made in 1873 by G. S. Killam, and recorded in the county surveyor's record, page 85, specifically states that the quarter corner between 31 and 32 was a 'recognized government corner,' and that the lines established at that time were run from said corner. It is the conclusion of the undersigned that the lines established at that time in Section 32 have been substantially adhered to since, which lines indicate that the point used in this survey and report is the point referred to by Killam as a 'recognized government corner.'

"[Signed]   J. L. Parsons
"J. A. Moeller."

Owing to the fact, hereinafter explained, that, when reduced to briefest terms, the dispute turns upon the measure-

ment and location of a single line, and that the pertinent de-
tails may readily be comprehended from their simple statement,
we refrain from extending this opinion to include cuts of the
maps, plats, and diagrams put in evidence by the respective
parties.

The line is the boundary or division line between Sections
31 and 32, and the storm center of controversy is the proper
location of the quarter corner which, theoretically, should be
found half way between the section corners on the line described.
Neither the quarter corner nor the section corner to the north
or to the south is now marked or witnessed by a monument, post,
pit, or mound set or made at the time of the government survey.
There is, however, an apparent mutual concession that the high-
way along the north side of the two sections sufficiently indi-
cates the northern terminus of the line between 31 and 32. The
record shows that, when the government survey was made, the
common corner on the south between 31 and 32 was found to be
in a slough, where the ordinary monuments could not well be
used, and its location was indicated by a "witness corner," 15
chains east of the true corner. From the "witness corner" the
surveyors measured north 20 chains, thence west 15 chains to the
true line, and thence north between the sections. The original
notes of this survey will be referred to later. There is now no
discoverable original mark or monument of the location of either
the witness corner or true corner above mentioned. As is com-
monly known, the original marks of the survey of our prairie
lands consisted of wooden posts, mounds of earth, and shallow
pits dug in the soil. In the nature of things, these monuments
were of a temporary character; and, in the 70 or more years
which have since intervened, these silent witnesses have become
entirely obliterated, and the instances must now be rare where
their location is retained in the memory of the "oldest inhabi-
tant." As a natural result, disputes arising in these later days
over the true location of original lines and corners are often
very difficult of satisfactory adjustment, and resort is neces-
sarily had, not only to public records, but to a great variety of
circumstances tending in some degree to solve the problem.
Courts, surveyors, and commissions charged with such duty are
therefore wont to observe, not only the government field notes,

but the location of other lines and corners which are not in controversy; corners and lines which have had general recognition by the public; the location of fences and other farm improvements; the reports and marks of other surveys which have been made; the presence or absence of stakes, posts, stones, or other visible objects claimed by any party in interest to be monuments of the original or later survey; and generally, all obtainable information, direct or circumstantial, which can be of any assistance in reaching a just conclusion. In all such cases, the official notes of the original survey have an important, though not necessarily conclusive, bearing. For the purposes of a case like the one before us, the actual location of a section corner or quarter corner, as made and marked by the government engineers in the original survey, is controlling, whether it does or does not agree with the official minutes or notes which those engineers made of their work. For example, the minutes of the original survey of the line between Sections 31 and 32 describe the quarter corner as being established at a point 40 chains north of the section corner; but, if the original government monuments were still existent, and upon a remeasurement of the line between them it were demonstrated that, instead of being just 40 chains in length, it was materially less or more than 40 chains, the actual location of the quarter corner as marked would prevail over the field notes, although the necessary effect of the discrepancy would be to create some inequality in the area of the "quarter sections" affected by it. The same rule would apply, and the same result would follow, if the marks or monuments of the original survey were entirely obliterated, provided that the evidence is sufficient to identify the places where the original survey located them. Where, however, a corner is "lost,"—that is, where there is no monument to mark its location and the evidence is insufficient to support a finding establishing such original location,—then a reproduction of the original survey according to the field notes by actual measurements from known or accepted corners or monuments will control.

But a corner is not "lost," even though it be without an original monument of any kind, if the evidence be reasonably sufficient to establish its location. Not that the field notes have no evidential value. They are legitimate and proper evidence,

to be considered by the surveyor and the court for what they are worth; but, if the evidence as a whole shall justify it, they do not preclude a finding which discredits their accuracy.

Returning now to the matter of the surveyor's report to the court, it should be said that it was met by the objections of the appellant, who moved that it be disapproved. The objections challenged the report and the survey as being grossly erroneous and unfair, and as not conforming to the terms of the agreement for submission to arbitration. The evidence offered in support of the objections, so far, at least, as the same is abstracted, is mainly in the nature of a cross-examination of the surveyor, Parsons, upon the method and manner of the work done by him, and upon the matters mentioned in the report. The trial court, after due deliberation, overruled the objections to the report, and approved and confirmed its findings. It is from this ruling that appeal has been taken.

The burden of appellant's complaint in argument is that the survey and report do not follow the agreement between the parties. Before noticing this exception more fully, we call attention to the fact that, by the terms of the agreement, the survey was to be made by Parsons only, and it was only on the "completion of such survey" that Snook and Moeller were to be called into conference. It appears that the two persons last named were both surveyors, and had each made an earlier independent survey of the same lines. Their surveys did not agree, and neither commanded acceptance by both parties; but, in the agreement to submit the survey to Parsons, it was provided, as we have seen, that both should be consulted by Parsons, and that an agreement reached by two of the three surveyors should be accepted as final by the contending parties. The report was signed by Parsons and Moeller only. Snook made no dissenting or minority report.

The purpose for which Parsons was named is expressly stated to be "the locating of the lines" and the "boundaries between the respective parcels of land herein referred to." In so doing, he was directed to procure the government field notes, so far as necessary to determine the true location of said boundary line, and was to permit the parties to be heard in person and by witnesses, and give due notice to the parties of the

time and place of the hearing. It is then specified that he "shall take into consideration all of the stones and corner markings to which his attention may be called, * * * also, previous surveys, fences, and other facts which may have a bearing upon the true location of said boundaries, and may do such other and further acts as in his judgment may be required for the purpose of correctly, equitably, and fairly adjudicating the rights between the parties hereto with reference to said boundaries. Should there appear to be either an excess or shortage in the lands of any of the parties hereto, it shall be apportioned according to law in locating said boundary lines."

We have repeated these provisions of the agreement because of the strong insistence of appellant's counsel that Mr. Parsons wholly ignored these terms in making his survey.

These provisions, so far as they relate to the kind and character of evidence the surveyor was to take into consideration, required of him nothing more nor less than he was bound to observe, had they not been written into the agreement; nor is there anything of record to indicate that he failed to observe each of them to the letter. True, he may have failed to give the facts, or some of them, that weight and influence to which they were entitled, or may have given them, or some of them, more weight and influence than counsel or the court might be willing to accord them; but who is authorized to say that he did not honestly, and to the best of his ability, examine into and consider every item of the evidence? Counsel may have believed, and evidently still believes, that an examination and survey such as the submission called for would result in a finding for his client; but surely, the surveyor was under neither legal nor moral obligation to reach such conclusions, unless it expressed his own honest judgment.

That the argument for appellant is built upon a mistaken foundation is demonstrated in the final declaration that:

"Parsons was to do two things at least, if he followed the agreement: First, he was to locate the true line, and for this purpose he was to secure and follow the government field notes; and second, if there should be an excess or shortage in the lands of any of the parties, he was to apportion it according to law."

Taking up the first proposition, counsel misapprehends the

terms of the agreement. The surveyor was not to "follow the government field notes." The duty imposed upon him was to "correctly determine the true location of the boundary line." In doing this, he was to give due attention to the field notes, but he was also to give due consideration to all the other evidence therein referred to, and, from all the facts so developed, including the field notes, find the true location of the disputed boundary. The rule of law applicable to such a situation we have already discussed, and need not here repeat it.

The fact that the location of the quarter corner, as fixed by the survey, is more than 100 feet north of the point where a strict adherence to the field notes would locate it, is one of the legitimate items of evidence in the appellant's favor, and we are bound to assume that the surveyor and the trial court gave it due consideration; but we are persuaded that the record as a whole lends sufficient support to their conclusion. We shall not stop to enumerate all the numerous facts and circumstances which combine to sustain the report. Some of them, taken separately and of themselves, are of slight significance; but as a whole, they are quite persuasive. We are disposed, also, to give weight to the judgment of the trial court, whose opportunity to observe the parties and witnesses is superior to our own.

Finally, the objection raised that the report does not undertake to apportion the "excess and shortage" of the lands of the parties is without merit. The quarter corner having been established at what is found to be its true location, there is neither excess nor shortage to apportion. If it be true, as it probably is, that the lines radiating from this quarter corner divide the area of land affected thereby into unequal parts, it is also true that each of these unequal parts has neither greater nor less acreage than it would have had, were the original monuments of the original survey still standing.

If, as is frequently the case, it happens that, by reason of errors or defects in the original survey, a section has been unequally divided, and the purchaser of a "quarter" or "forty" has acquired a larger acreage than has his neighbor, who buys another quarter or forty in the same section, there is neither

legal nor equitable obligation on the part of the former to divide the excess with the latter.

Taking the record as we find it, we discover no material error of which appellant can complain. The ruling appealed from is—*Affirmed*.

EVANS, C. J., PRESTON and DE GRAFF, JJ., concur.